HENRY SAJDAK, Plaintiff-Appellee, v. LORETTA SAJDAK, Defendant-Appellant (Arnold Landis, Petitioner for Fees-Appellee; Loretta Sajdak, Respondent-Appellant).

First District (6th Division) Nos. 1—88—1727, 1—89—3035, 1—90—0725 cons.

Opinion filed January 10, 1992.

William J. Stevens, of Chicago, for appellant.

Leonard J. Petrucelli, of Mt. Prospect, for appellee Henry Sajdak.

Arnold Landis, of Chicago, appellee *pro se*.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Loretta Sajdak, appeals from an order entered in favor of the plaintiff, her brother, Henry Sajdak, in a suit brought by Henry Sajdak over property left to the parties by their mother, Bernice Sajdak; she appeals from an order granting the plaintiff $10,000 attorney fees as sanctions for untrue pleadings pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—611); and she also appeals from an award of attorney fees to her former attorney, Arnold Landis. Landis has filed a cross-appeal maintaining that the award of attorney fees was insufficient.

The complaint alleged that the plaintiff was the owner of a 40% beneficial interest in the property and the defendant was the owner of a 60% beneficial interest. The defendant occupied one of two apartments on the property, and she collected rents for the second apartment. He maintained in count I that he was entitled to an accounting from the defendant for all rents and profits received from the date of his mother's death. In count II he alleged that approximately three years after his mother's death he and the defendant entered into a land trust agreement which, he maintained, created a partnership between him and the defendant, the purpose of which was to carry on the business of renting apartments in the property. He asked that the

partnership be dissolved and the property sold and that he receive 40% of the proceeds of the sale.

The defendant filed an answer in which she denied that the plaintiff was entitled to an accounting; she maintained affirmatively that the rental income she received had been used for payment of the real estate taxes; gas, electric and water bills; and the upkeep, maintenance and repairs of the property. In response to the complaint for a dissolution of a partnership she alleged that her mother, Bernice Sajdak, was of unsound mind when she executed the amendment to the land trust which granted the plaintiff a 40% interest. She also denied the existence of a partnership. In his reply, the plaintiff denied that Bernice Sajdak was of unsound mind and that she lacked the legal capacity to execute the amendment to the land trust.

The defendant filed a counterclaim in which she alleged that under the terms of the land trust originally created by her mother, the defendant was the sole contingent beneficiary. She was to receive the entire beneficial interest in the land trust from her mother because the defendant had taken care of her mother for a period of years and had used her own resources to maintain and improve the property. She alleged that in reliance on the representations of her mother, she took care of her mother and paid all expenses on the property which exceeded approximately $50,000. She further alleged that the plaintiff "surreptitiously and without knowledge" of the defendant obtained the amendment to the land trust which granted the plaintiff 40% beneficial interest when at the time of the execution of the amendment, her mother was of unsound mind and memory. The counterclaim asked that the amendment be declared invalid and that the court impress a lien against the real estate on behalf of the defendant in the amount of approximately $50,000.

After a trial, the judge held that a partnership existed between the plaintiff and the defendant; he ordered that the partnership be dissolved and the partnership property, consisting of the beneficial interest in the land trust, be sold. The judge also approved an accounting prepared by the plaintiff, requiring the defendant to pay to the plaintiff 40% of the rents from the second-floor apartment, along with 40% of the reasonable rental value of the first-floor apartment which had been occupied by the defendant. He granted the defendant a 10% deduction from the award due the plaintiff. The deduction represented a credit given the defendant for management services. The judge denied the defendant's counterclaim. A sale of the property was held, and the defendant purchased the property for $190,000; she paid the plaintiff $76,000, his 40% share of the sale price.

The plaintiff filed a motion pursuant to section 2—611 of the Code of Civil Procedure for attorney fees and sanctions. (Ill. Rev. Stat. 1983, ch. 110, par. 2—611.) He alleged that the defendant had falsely pleaded that the plaintiff was not the owner of a 40% share of the beneficial interest in the land trust and that the defendant had falsely denied the existence of a partnership between the plaintiff and herself. The procedure followed in the pursuit of the claim for sanctions is involved and confusing. For the sake of brevity, we will discuss the petition for sanctions in more detail later.

Arnold Landis, who had represented the defendant during a portion of the trial until she dismissed him, also filed a fee petition. The judge denied the defendant's motion to dismiss the petition and ordered the defendant to pay Landis $5,213.15.

We turn now to the facts. In 1959, Bernice Sajdak purchased a lot located at 6146 North Meade in Chicago, and had a two-flat building constructed on the property. Bernice's two children, the defendant and the plaintiff, lived with her in the first-floor unit of the building, and the second-floor apartment was rented. The defendant contributed almost $8,000 toward the purchase of the building; the plaintiff made no contribution to the purchase price.

In 1963, the plaintiff married and moved out of the building. In 1973, however, the plaintiff, a Chicago firefighter, had the utility bills for the building placed in his name to support his claim that he was a Chicago resident. He did not pay any of the utility bills for the building, nor did he contribute to the payment of real estate taxes or insurance on the property.

On February 10, 1975, Bernice executed a land trust agreement with Chicago Title & Trust Company, naming herself as sole beneficiary and naming the defendant as the sole contingent beneficiary upon Bernice's death. On April 29, 1980, Bernice amended the land trust, naming both the plaintiff and the defendant as successor beneficiaries. The amendment to the trust agreement indicated that, upon Bernice's death, the defendant would receive a 60% share of the beneficial interest in the land trust, and the plaintiff would receive a 40% share.

Bernice Sajdak died on February 13, 1982. That same day, the plaintiff and the defendant opened a joint savings account at Norwood Federal Savings & Loan Association; a deposit of $1,500 was made into the account. The record does not indicate whose money was used to make the deposit. The defendant's attorney stated in oral argument that the original deposit was made by the defendant. Deposits and withdrawals were made from the account until the account was

closed by the defendant on January 4, 1983, without notice to the plaintiff. During Bernice's lifetime, the defendant contributed to the expenses of and improvements to the building. After Bernice's death, the defendant managed the property and paid $11,139 in capital improvements and expenses for the property.

On March 11, 1982, the plaintiff and the defendant executed an acceptance of transfer of the beneficial interest in the land trust, which gave the defendant a 60% share and the plaintiff a 40% share. On June 19, 1982, the defendant executed under oath a State of Illinois inheritance tax return for the estate of Bernice Sajdak, stating that she was the owner of a 60% share and that the plaintiff was the owner of a 40% share. From 1982 through 1988 her individual income tax returns show the rental income of the property; she listed herself as a one-half owner of the property.

Dr. Stanley Milewski testified that he examined Bernice on numerous occasions between 1964 and 1981. In March 1980, Dr. Milewski suffered a heart attack. He took approximately 1 or 1½ years off after his attack. However, he did see patients between March and September of 1980. He saw Bernice Sajdak on September 12, 1980, and determined that she had a slow pulse. He testified that a slow pulse rate could affect a person's mental capacity. He later explained that he simply meant that a slow pulse could cause a person to pass out. He also indicated that Bernice's pulse rate did not ever cause any diminution of her mental capacity. During his examinations of her from 1964 to 1981, he found Bernice to be a person who had full "capacity [sic] of her whereabouts"; she was able to communicate with people and conduct her own business. She never complained of a memory loss. He said she was in fantastic condition and her mental condition was very good.

Edward Andrews was a tenant in the second-floor apartment from May 1979 through April 1983. He paid rent of $400 a month to Bernice Sajdak. He met and talked with her quite often, at least three or four times a week. He took her shopping with his mother at least once a week or once every two weeks. Before Bernice was hospitalized he paid the rent to her and after that to the defendant. When the lease was up, the defendant raised his rent $125 and he had to move out. He visited Bernice in her apartment many times and never saw her lose her balance or fall. She never lost her memory; she knew his name and knew who he was. She was able to carry on a conversation with him.

The defendant testified that in early 1980 Bernice was "all mixed up." Bernice burned pots and hid them in the basement; she threw

her social security checks into the garbage. The defendant believed that Bernice was of unsound mind because Bernice did strange things, such as asking if she could sleep with the defendant because she thought there was a man in her bed, and taking all of the clothes out of her closet during the middle of the night. Bernice took Valium for seven or eight years.

Mary Lou Koerner, a friend of Bernice and the defendant, testified that Bernice was very forgetful in the spring of 1980 and that she could not keep her days straight. Bernice sometimes had trouble recognizing Koerner.

We will first address the defendant's argument that the judge erred in finding that a partnership existed between her and the plaintiff. The issue of whether a partnership exists is a question of fact, and the factfinder's determination of this question will not be disturbed unless it is against the manifest weight of the evidence. (*Peterson v. Prince* (1981), 102 Ill. App. 3d 220, 224, 430 N.E.2d 297.) In the absence of a written partnership agreement, however, this court must examine the intent of the parties when ascertaining whether a partnership was formed, and this court must also examine the facts and circumstances surrounding the alleged formation of the partnership. (*McCorkle v. Tyler Reporting Co.* (1987), 159 Ill. App. 3d 62, 68, 512 N.E.2d 25.) Moreover, the burden of proving the existence of a partnership rests upon the party asserting it. (*Seidmon v. Harris* (1988), 172 Ill. App. 3d 352, 357, 526 N.E.2d 543.) In *Reed v. Engel* (1908), 237 Ill. 628, 631, 86 N.E. 1110, 1111, the supreme court spoke as follows:

> "A partnership is never created between parties by implication or operation of law, apart from an express or implied intention and agreement to constitute the relation. [Citation.] Even where the parties agree to enter into a joint enterprise and share in the profits, a partnership, as between themselves, does not necessarily result. The intention of the parties always controls. [Citations.]"

■ The issue, therefore, is whether the plaintiff has maintained his burden of proving that he and the defendant intended to form a partnership. In support of his claim the plaintiff emphasizes the following facts: (1) the defendant signed an acceptance of a 60% share of the beneficial interest in a land trust; and (2) the defendant and the plaintiff opened a joint savings account into which the defendant deposited the rental income from the second-floor unit of the building. The plaintiff places undue weight on those factors. When the plaintiff and the defendant accepted their respective shares of the beneficial

interest in the property and opened a joint bank account, they became co-tenants in personalty. The Illinois Partnership Act expressly states that joint tenancy or tenancy in common does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property. Ill. Rev. Stat. 1983, ch. 106½, par. 7(2).

The language of the trust agreement is inconsistent with an intent to form a partnership. Section 25(2)(b) of the Illinois Partnership Act provides:

> "A partner's right in specific partnership property is not assignable except in connection with the assignment of the rights of all the partners in the same property." (Ill. Rev. Stat. 1983, ch. 106½, par. 25(2)(b).)

Contrary to this statutory provision, the trust agreement provides that any beneficiary may unilaterally transfer his individual interest in the trust. The Illinois Partnership Act further provides that upon the death of a partner, his interest in the partnership property automatically vests in the other partners; a partner is not allowed to dispose of partnership property upon his death. (Ill. Rev. Stat. 1983, ch. 106½, par. 25(2)(d).) The trust agreement, however, provides that upon the death of a beneficiary, his interest will pass to the executor of his estate. Thus, the language of the trust agreement itself militates against a finding of partnership.

There was no agreement that the plaintiff and defendant operate the building together. The defendant managed and operated the building without the plaintiff. From 1982 through 1986 the defendant paid $11,139 in capital improvements and expenses. She provided for snow removal, grass cutting and other things necessary for the upkeep of the building. The plaintiff did not help the defendant during those five years. There is no evidence of joint management or joint control. (See *Prassas v. Nicholas W. Prassas & Co.* (1981), 94 Ill. App. 3d 311, 418 N.E.2d 904.) The plaintiff never contributed to the payment of expenses. The fact that the defendant kept all the rent proceeds is the strongest evidence that she did not consider that the partnership existed. We conclude, therefore, that the plaintiff presented no evidence of a meeting of the minds of the parties showing an intent to form a partnership. Consequently, we hold that the finding of the judge that a partnership existed is contrary to the manifest weight of the evidence.

We wish to make it clear that we are passing on the issue as it has been presented to us: Does the evidence establish the existence of a partnership? We have not been asked to fashion a remedy, equitable

or otherwise, to resolve disputes between beneficiaries of a land trust. (*Cf. Davis v. Kurtz* (1988), 165 Ill. App. 3d 417, 518 N.E.2d 1297.) In *Regas v. Danigeles* (1964), 54 Ill. App. 2d 271, 203 N.E.2d 730, the trial judge expressly found that four co-owners of a beneficial interest in a land trust were not partners. The appellate court held that it need not decide whether a partnership existed. It concluded that in a case of a "deadlock" between beneficiaries of a land trust, a court could exercise its equitable discretion to declare the relationship at an end and order the co-owners to sell the beneficial interest. The plaintiff's attorney told us in oral argument that the "deadlock" arose when the defendant closed the joint bank account without notice to the plaintiff and refused to give him an accounting. He persisted, however, in his view that resolution of the "deadlock" required the recognition of the existence of a partnership. We disagree that a "deadlock," as that term was used in *Regas v. Danigeles*, existed in this case. Other adequate remedies exist to right any wrong committed by the defendant; we note that the original complaint asked only for an accounting. To hold that any dispute between co-beneficiaries establishes a "deadlock" which would entitle a party to a court-ordered sale of the beneficial interest would turn on its head the rule expressed by the supreme court barring the right of partition of realty to beneficiaries of a land trust. (See *Breen v. Breen* (1952), 411 Ill. 206, 103 N.E.2d 625; *Aronson v. Olsen* (1932), 348 Ill. 26, 180 N.E. 565.) We hold simply that a remedy does not lie by fictitiously creating a partnership where none exists. Therefore, we conclude that the judge erred in dissolving a nonexistent partnership and compelling the sale of the property. What remedy is now available to the plaintiff or the defendant after the property has been sold and the proceeds divided is also a question that is not before us.

■ The defendant also contends that the judge erred when he ordered that the defendant was to be charged rent for the apartment she occupied for the period beginning with the death of her mother. Neither party has cited a case deciding whether a beneficiary of a land trust, who occupies all or part of the trust property, is required to pay rent to the other beneficiaries. The two cases cited by the defendant, *Davis v. Kurtz* (1988), 165 Ill. App. 3d 417, 518 N.E.2d 1297, and *Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 464 N.E.2d 751, are not in point because neither case involved any claim for rent. Our research has disclosed no case precisely in point.

The joint rights and obligations act (the Act) provides:

"When one or more joint tenants, tenants in common or copartners in real estate, or any interest therein, shall take and

use the profits or benefits thereof, in greater proportion than his or their interest, such person or persons, his or their executors and administrators, shall account therefor to his or their co-tenants jointly or severally." Ill. Rev. Stat. 1983, ch. 76, par. 5.

The statute which was the predecessor of the present Act has been construed to require a tenant in common in real estate to account to his co-tenants for the reasonable rental value of his use and occupancy of the property. (*McParland v. Larkin* (1895), 155 Ill. 84, 39 N.E. 609; see also *Clarke v. Clarke* (1932), 349 Ill. 642, 183 N.E. 13.) We recognize that those cases are distinguishable because the parties in this case are co-beneficiaries of a land trust, which is personalty, not realty. We believe, however, that general principles of equity dictate that the rule requiring a co-tenant of realty to account for the reasonable rental value of his use and occupancy of property should apply in this case also.

In *People v. Chicago Title & Trust Co.* (1979), 75 Ill. 2d 479, 492-93, 389 N.E.2d 540, 545, the supreme court looked beyond the land trust fiction in applying a tax statute. The court stated:

"In reality the transfer to the trustee is a formality involving a shifting of legal documents. The land trust is, in fact, a fiction which has become entrenched in the law of this State and accepted as a useful instrument in the handling of real estate transactions. Outside of relationships *based on legal title*, the trustees' title has little significance. [(Emphasis in original.)] Particularly in tax law, the realities of ownership are far more important than the technicalities of transfer. In other branches of law, *where control is the best indicia of ownership, appellate courts have found the beneficiaries to be owners.* See, *e.g., Dunlop v. McAtee* (1975), 31 Ill. App. 3d 56, 59 (mechanics lien); *Robinson v. Walker* (1965), 63 Ill. App. 2d 204 (dramshop); *Brazowski v. Chicago Title & Trust Co.* (1935), 280 Ill. App. 293 (tort liability)." (Emphasis added.)

The reasoning of *People v. Chicago Title & Trust Co.* and the cases cited therein is persuasive in this case. Since the beneficiaries control the property they should be treated as owners here. The Act is intended to determine the rights of use and occupancy of co-owners or co-tenants of real estate. The legal fiction of a land trust should not allow a trust beneficiary to use the property without accounting to his co-beneficiaries. We hold, therefore, that section 5 of the Act applies to beneficiaries of land trusts. For that reason, the order of the judge directing the defendant to account to the plaintiff for 40%

of the reasonable rental value of the apartment which she occupied is affirmed.

The defendant next contends that the judge erred in imposing sanctions under Supreme Court Rule 137 (not section 2—611) and that the findings of the judge did not meet the requirements of the rule. (134 Ill. 2d R. 137.) The plaintiff maintains that the order was an agreed order and is, therefore, not appealable. As we indicated before, the record on this point is involved and confusing.

On June 8, 1987, the plaintiff filed a motion for leave to file a petition for sanctions pursuant to section 2—611 of the Code of Civil Procedure. (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.) The motion was continued from time to time; and on November 6, 1989, the plaintiff filed an amended petition for sanctions under Supreme Court Rule 137, which was adopted on August 1, 1989, and which preempted section 2—611. (See Ill. Ann. Stat., ch. 110A, par. 137, Committee Comments, at 68 (Smith-Hurd 1989).) The prayer of the Rule 137 petition, however, asked for relief pursuant to section 2—611. The petition was signed by the plaintiff but not by his attorney, contrary to Rule 137 (and section 2—611).

On December 27, 1989, the defendant filed a response to the petition for fees; it was signed by William Stevens, the new attorney for the defendant, but not by the defendant. That response made no reference to either Rule 137 or section 2—611. The response maintained that "[s]anctions are ordinarily limited to the attorney's fees actually incurred in response to the alligation [*sic*] found to be untrue and not to all the work in the suit." The response pointed out that the petition for fees failed to identify with specificity the relationship between the legal work performed and the allegations which were claimed to have been false.

On February 7, 1990, the parties appeared for a hearing to determine the amount due the plaintiff under the accounting claim and to determine whether the defendant was liable for attorney fees. Before passing on the petition for fees, the judge asked the attorneys to go into his chambers with him. After an unreported hearing in chambers, the judge and the parties returned to open court, and the judge said this:

> "Now, for the record, counsel and I have talked about the existing petition under 2—611 for sanctions—for costs and attorney's fees against the defendant, Loretta Sajdak. I have recommended that even though attorney's fees will amount to over 20 some odd thousand dollars, 23,000 or so, I am knocking it down to $10,000. Provide for that in the order."

The judge continued the case until March 14, 1990. The order entered that day provided that the defendant was to pay the plaintiff the sum of $15,000 under the accounting claim. In addition the order provided that the defendant was to pay $10,000 attorney fees "pursuant to the section 2—611 petition for fees and affidavits submitted." The order also expressly provided, pursuant to Supreme Court Rule 304(a), that there was "no just cause for delay of enforcement or appeal" of the order. We accept the representation of the parties that that language appears. That language is not legible to us in the copy of the order contained in the record.

On the following day, February 8, there was filed, apparently without notice, the defendant's answer to the section 2—611 petition. (The record does not show any previous filing.) That answer was signed by the defendant on July 21, 1987, and had been prepared by the defendant's then attorney, Thomas Poulakidas. That answer denied that her allegations of her counterclaim and denials in her answer had been made without reasonable cause.

On February 27, 1990, the plaintiff served the defendant with notice that he would file a motion to vacate the order of February 7 and seek a rehearing on the section 2—611 petition. It was later disclosed that the plaintiff's attorney prepared the motion after he learned that the defendant intended to appeal the February 7 order.

On March 9, 1990, the defendant filed a notice of appeal. On March 14, the parties appeared, and the plaintiff's attorney filed his motion to vacate. Mr. Stevens, the defendant's attorney, said that the judge lacked jurisdiction to hear the motion to vacate because the defendant had filed a notice of appeal on the 30th day after the entry of the February 7 order. The following occurred:

"MR. PETRUCELLI [PLAINTIFF'S ATTORNEY]: You [the judge] then conducted a pretrial conference and during that pretrial conference, certain discussions were had relevant to a settlement of the 2—611 in lieu of certain actions being taken by the defendant, Mr. [sic] Sajdak.

THE COURT: There were certain discussions and representations and conditions that resulted and were conditioned upon the fact that there would be no appeal.

* * *

MR. STEVENS: I said that I understood that the court was prepared to entertain a motion to award the full amount of the attorney's fees requested if I was unsuccessful persuading Miss Sajdak to drop her appeal, and I indeed was unsuccessful in

persuading her to drop the appeal and in filing a notice of appeal.

THE COURT: Well, if necessary, I will vacate that order insofar as it affects the agreement and the conditions that you, Mr. Stevens, you, Mr. Petrucelli and I as a judge discussed and I will vacate that part.

MR. STEVENS: Your honor, I respectfully suggest that the vacation of that order should await the time when the matter is returned from the appellate court, that the filing of the notice of an appeal has shifted the jurisdiction of the court to the appellate court and while I fully expect that—

THE COURT: I will set up a statement right now that it was conditioned upon the fact that you were going to get—*you said you thought you could get her to waive an appeal.*

MR. STEVENS: I tried very hard to get her to do that, Your Honor.

\* \* \*

THE COURT: \*\*\* I relied upon your representation, Mr. Stevens.

MR. STEVENS: Judge, I did the best I could. I really tried." (Emphasis added.)

The judge then vacated that part of the order of February 7 ordering the payment of $10,000 attorney fees and continued the case until May 2, 1990, for a hearing on a petition for fees. That hearing has still not been conducted.

■ We understand the trial judge's justified sense of having been used, which would never have arisen if Mr. Stevens had taken the simple step of informing the judge of his client's intention to appeal before the notice of appeal was filed. Nonetheless, we must reluctantly disagree with the plaintiff's contention that the defendant waived the right to appeal the granting of sanctions under section 2–611. The record establishes that the judge and the attorney for the plaintiff may have believed that the order was an agreed order, but we cannot say with certainty that it was. The colloquy between the judge and Mr. Stevens shows that Mr. Stevens told the judge that he thought he could get the defendant to waive her appeal, and he expressed the hope that he would be able to convince his client not to appeal. Whether a party has agreed to an order and thus surrendered his right to appeal should be free from doubt. In this case, the burden is on the plaintiff to establish that the defendant agreed to the order. (*Hempstead v. Broad* (1918), 282 Ill. 574, 118 N.E. 994.) We judge

that the plaintiff has failed to maintain his burden, and we hold that the order is appealable.

The defendant argues that the entire order imposing sanctions should be reversed because it did not comply with the requirements of Supreme Court Rule 137, which provides that where a sanction is imposed "the judge shall set forth with specificity the reasons and basis of any sanction so imposed either in the judgment order itself or in a separate written order." Although the defendant's pleadings were filed before the adoption of the rule, we believe that the rule should be given retrospective application since it imposes no greater duty on the parties than did section 2—611. The only change relevant to the case before us is a procedural one—the requirement that the judge make specific findings in his order imposing sanctions. Compare *Ignarski v. Heublein* (1988), 171 Ill. App. 3d 830, 835, 525 N.E.2d 995, 998 (amended section 2—611 to be applied prospectively because the amendment did not affect a "mere change in an existing procedure or remedy").

■ The judgment order entered February 7, 1990, does not meet the requirements of Rule 137. Under the peculiar circumstances of this case, however, considering the manner in which the issue was presented to the judge by the pleadings, with the apparent acquiescence of the defendant's attorney and with no claim at any time that the order did not comply with Rule 137, we conclude that the defendant may not now invoke the requirements of Rule 137. We reject the defendant's claim that the order should be reversed because of the absence of specific findings in the order.

We do, however, judge that part of the order imposing sanctions should be reversed. The judge made his determination that sanctions were proper based on his apparent finding that the defendant's claim that her mother was of unsound mind and the claim that no partnership existed were not made with reasonable cause. Since we have held that a partnership was not established, any finding by the judge that sanctions should be imposed because of the defendant's allegations that a partnership did not exist is not justified and is therefore reversed.

The next question is whether the defendant's claim that her mother lacked the mental capacity to amend the trust supported the imposition of sanctions. In order to assess fees against a party for pleading falsely two requirements must be met: (1) the pleading must be made without reasonable cause, and (2) it must be untrue. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) The defendant does not contend that the judge's finding that Bernice did possess the

required mental capacity was against the manifest weight of the evidence. Therefore, for the purposes of this review the defendant concedes that her assertion that her mother lacked the required mental capacity was not true. The issue is reduced to whether the judge properly determined that the defendant's pleadings were made without reasonable cause.

Preliminarily, we should identify the proper standard on review. A number of cases have held that an abuse of discretion standard is applicable on review of the granting or denial of section 2—611 relief. (See, *e.g.*, *St. Paul Federal Savings & Loan Association v. Avant* (1985), 135 Ill. App. 3d 568, 579, 481 N.E.2d 1050, 1058.) We agree in part with those cases. The burden is on the party seeking the imposition of sanctions to prove that a pleading was untrue and that it was made without reasonable cause. (*McCormick v. Louis Joliet Bank & Trust Co.* (1983), 114 Ill. App. 3d 205, 448 N.E.2d 905.) In determining whether the party seeking the imposition of sanctions has maintained that burden of proof, the trial judge must make findings of ultimate fact—whether the allegations are false and, if false, whether they were made without reasonable cause. Like any finding of fact, the standard on review is whether that finding of ultimate fact is against the manifest weight of the evidence. It is only *after* a finding that the party seeking the imposition of sanctions has maintained his burden of proof that the court's discretion is invoked to determine whether any sanctions should be imposed or the amount of the sanction. Needless to say, if a judge's exercise of discretion is based on a finding of fact which is contrary to the manifest weight of the evidence, discretion has been abused.

 We believe there is substantial evidence to support the judge's finding that the defendant pleaded a lack of mental capacity of her mother without reasonable cause. Not only was the testimony of two disinterested witnesses, Dr. Milewski and the tenant Edwards, favorable to the plaintiff, the judge had before him the evidence that the defendant had signed an acceptance of the amendment to the trust agreement, had opened a joint account with the plaintiff and had represented to the State and Federal governments over a period of years that she possessed either a one-half or 60% interest in the property. The evidence of her own conduct was the most damaging to her position.

In *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146, the plaintiff alleged and testified that the defendant's car collided with the plaintiff while the plaintiff was crossing the street in a crosswalk. She had testified in an unrelated case that the defendant had

not struck her. The jury rendered a verdict in favor of the defendant, who appealed the denial of an award under section 2—611. The appellate court reversed the order denying fees. We believe the facts of the case before us support the imposition of sanctions even more strongly than the facts of *Chavez.*

We conclude that the judge's finding that the defendant had made her false representation without reasonable cause was not against the manifest weight of the evidence and the imposition of sanctions was not an abuse of discretion. For that reason, the order imposing sanctions for the defendant's claim that her mother lacked the required mental capacity is affirmed.

We also believe that the judge was justified in making his determination that the defendant was liable for sanctions without any further hearing. (See *Fried v. Barad* (1989), 187 Ill. App. 3d 1024, 543 N.E.2d 1018.) However, since we are reversing part of the judgment granting sanctions, we remand the cause to the circuit court with directions to conduct a hearing to determine the amount of fees incurred which may be attributed to the response to the defendant's claim that her mother lacked the required mental capacity.

The defendant next maintains that the judge erred by refusing to admit evidence of expenditures she had made for the property during her mother's lifetime and that the judge erred in denying her prayer for imposition of an equitable lien for those expenses. The total amount of her claim was $50,000. Her counterclaim alleged that she was to receive the entire beneficial interest in the land trust "by virtue of her taking care of her mother for a period of years and using her own resources to maintain and improve the property" and that "in reliance of [*sic*] the representations of decedent Bernice Sajdak *** the said defendant and counter-plaintiff fulfilled her obligations totally, taking care of her mother until the date of her death and paying all real estate taxes on the property, maintaining same and making substantial improvements on the property in excess of approximately $50,000." The counterclaim further alleged that the plaintiff, to defeat the defendant's right to receive the beneficial interest from her mother, "surreptitiously and without knowledge of defendant and counter-plaintiff, obtained an amendment to the land trust agreement" when he knew that "Bernice Sajdak was of unsound mind and memory and had no legal capacity to execute said amendment."

Initially we note that the defendant's brief does not, in the statement of facts or in argument, contain any facts that would support a finding that Bernice Sajdak represented to the defendant that the defendant was to remain the sole contingent beneficiary in consid-

eration of the defendant's caring for Bernice and using her own resources to maintain the property. We cannot accept the defendant's argument for a number of reasons. First, the keystone of her counterclaim *as pleaded* is that her mother lacked the required mental capacity to amend the trust agreement, a claim which she now concedes was not improperly decided against her. Second, the judge apparently concluded that the defendant failed to prove that she made the expenditures in consideration of a well-founded belief that she would remain the sole beneficiary. Again, her acceptance of the amended trust agreement is strong evidence against her position. Last, the judge concluded that the defendant had failed to establish that she used her own resources to maintain and improve the property. We note that the defendant herself testified, contrary to the allegations of her counterclaim, that the real estate taxes were paid from a joint account held by her mother and her. The judge pointed out that, during the time the defendant lived with her mother, she did not pay rent. The judge also held that the evidence did not establish that Bernice lacked sufficient funds to support herself and to maintain the property. The defendant does not argue that the judge's findings were against the manifest weight of the evidence. Even if she did, we would disagree.

The principal case relied upon by the defendant, *Burkholder v. Burkholder* (1956), 10 Ill. App. 2d 565, 135 N.E.2d 504 (abstract of opinion), does not assist her. In *Burkholder*, the plaintiff was a co-owner of the property, not merely a "person with a reasonable expectation" in the property. For these reasons, we conclude that the judge did not err in denying the counterclaim and in refusing to admit the defendant's proffered evidence.

■ The defendant's last claim in her appeal of the judgment in favor of the plaintiff is that the trial judge had prejudged the case; she refers to a statement the judge made after he held a settlement conference which occurred after the first day of trial. We have considered the remark by the trial judge to which the defendant refers and conclude that any claim that he had prejudged the case is completely without foundation.

We turn now to the defendant's appeal against the attorney fees award to Arnold Landis. The threshold issue before us is not whether Mr. Landis is entitled to fees; that issue is whether he may pursue his claim for fees in the same action in which he appeared as the attorney for the party from whom he is seeking fees. Landis has submitted no authority to support the position that he need not file a separate action at law for breach of contract. The defendant cited two divorce

cases in support of her argument that the judge lacked jurisdiction: *In re Petition of Neiman* (1972), 8 Ill. App. 3d 454, 289 N.E.2d 715 (*Magill*), and *Pressney v. Pressney* (1950), 339 Ill. App. 371, 90 N.E.2d 119. Both *Magill* and *Pressney* held that, in a divorce action, a court does not have jurisdiction to determine the fees to be paid to an attorney by a client. We believe that the holdings of *Magill* and *Pressney* have been overruled by the adoption of the 1970 Illinois Constitution and the enactment of section 508 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (Ill. Rev. Stat. 1985, ch. 40, par. 508).

In *Seniuta v. Seniuta* (1977), 49 Ill. App. 3d 329, 331, 364 N.E.2d 327, 327-28, the defendant engaged an attorney to represent him in an appeal of a divorce action. The attorney successfully concluded the appeal, but the defendant refused to pay any attorney fees. The attorney did not file a separate action at law; he filed his petition for fees in the same case which had involved the divorce action. The appellate court upheld an award in favor of the attorney. It pointed out that divorce judges previously would not attempt to set fees between a lawyer and his own client because of the absence of any provision for such an action in the divorce act. The court concluded that under the Illinois Constitution of 1970, all differences between law and equity had been abolished and that a circuit judge might hear any justiciable matter.

After *Seniuta* was decided, the Dissolution Act was enacted and provides in part as follows:

"(a) The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse ***.

* * *

(c) The court may order that the award of attorney's fees and costs hereunder shall be paid directly to the attorney, who may enforce such order in his name, or that they be paid to the relevant party. Judgment may be entered and enforcement thereof had accordingly." Ill. Rev. Stat. 1985, ch. 40, pars. 508(a), (c).

It was recognized that section 508 of the Dissolution Act codified the *Seniuta* decision in providing that the circuit court had authority to determine the liability of either spouse for his own, or the other spouse's attorney's fees and costs incurred in the dissolution proceeding. (*In re Marriage of Baltzer* (1986), 150 Ill. App. 3d 890, 502

N.E.2d 459; Ill. Ann. Stat., ch. 40, par. 508, Historical & Practice Notes, at 637 (Smith-Hurd 1980).) The Act also authorized the attorney himself to bring the action.

In *Gitlin v. Hartmann* (1988), 175 Ill. App. 3d 805, 530 N.E.2d 584, the appellate court held that an attorney was *required* to file his claim for fees in the circuit court of Kane County, where his client had filed an action for divorce, and upheld the dismissal of the attorney's action at law for fees filed in McHenry County. The court emphasized that "in a domestic relations proceeding, the best indicator of the propriety of an attorney's fees is the court in which the proceeding was heard." (175 Ill. App. 3d at 809.) It added that to permit an action for fees to be brought in a jurisdiction other than the one in which the attorney represented his client "would substantially weaken the apparent purposes of section 508 of the Dissolution Act." 175 Ill. App. 3d at 810.

■ It is our judgment that the holding of *Gitlin* may not be extended to any action for fees based upon common law contractual rights in the absence of a specific statutory authorization. The ramifications of *Gitlin*'s adoption here should be considered. If an attorney were discharged before the filing of a suit on behalf of his client, his only method of recovery would be in a separate action at law. But if a suit is filed and the attorney is then discharged, the mere filing of the suit grants him the right to maintain his own action in the same pending action. There is no justification for such a distinction. The question of the client's right to a jury trial arises. There is no question but that the client would be entitled to a jury trial in the action at law. Whether he would be entitled to a jury trial in an action such as this case is questionable. When we raised the question about a jury trial in oral argument, Landis' response was that the defendant did not ask for a jury trial. The defendant's failure to ask for a jury trial after a denial of her motion to dismiss is not controlling. She may have believed she was not entitled to one.

We do not believe that fee cases decided under the Dissolution Act are persuasive. Our reading of *In re Marriage of Baltzer* and *Gitlin* leads to the conclusion that those cases did not mean to extend their holdings beyond divorce actions. That the Dissolution Act is unusual is evidenced by the fact that a judge may grant temporary attorney fees from time to time. If the petition for Landis were to be authorized in this case, the cause of action of a discharged attorney in every case in which a suit was filed would be *required* to be adjudicated in that forum in which the attorney appeared for his client. That is a pronouncement which must come from the legislature or the supreme

court, not an intermediate court of review. Since the claim of Landis is based on his common law contractual right of *quantum meruit* without any statutory designation of a particular forum, we hold that the judge erred in denying the defendant's motion to dismiss Landis' petition. For that reason, the judgment in favor of Landis is reversed without prejudice to his right to pursue an action in an appropriate forum.

In summary, the judgment in favor of the plaintiff on count II is reversed; the judgment in favor of the plaintiff on count I is affirmed; the judgment on the plaintiff's petition for fees is reversed in part and affirmed and remanded in part; the judgment in favor of the plaintiff on the counterclaim is affirmed; the judgment in favor of Landis is reversed.

Judgments reversed, reversed in part and affirmed in part and remanded.

RAKOWSKI and LaPORTA, JJ., concur.